IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **PHILADELPHIA TRUST COMPANY,** as limited guardian of K.F., a minor,<br><br>*Plaintiff,*<br><br>v.<br><br>**TEMPLE UNIVERSITY HOSPITAL, INC.,**<br><br>*Defendant, Cross-Claimant.*<br><br>**THE UNITED STATES OF AMERICA,**<br><br>*Cross-Defendant.* | Case No: 2:21-cv-03413 |

**Goldberg, J.**                                                                                      **November 20, 2024**

# MEMORANDUM

The Philadelphia Trust Company—appointed by the Orphans Court of Philadelphia County as the limited guardian of K.F., a minor—brings this negligence action against Temple University Hospital, Inc. arising from injuries K.F. sustained at or shortly before birth. Temple now moves to preclude three of Plaintiff's experts from providing causation opinions at trial. It also moves for summary judgment in conjunction with its Omnibus Motion to Exclude. Plaintiff opposes the Motions, which I will deny.

**I.        BACKGROUND AND PROCEDURAL HISTORY**[1]

As the Parties are familiar with the background of this case, I repeat only the information pertinent to the pending Motions.

---

[1] These facts are taken primarily from Temple's Omnibus Motion to Preclude (ECF No. 59) and Statement of Undisputed Material Facts (ECF No. 60-1), Plaintiff's Response thereto (ECF No. 69-32), and Plaintiff's Statement

At 6:02 p.m. on February 18, 2018, Kimberly Shefcyk—K.F.'s mother—arrived at the Temple emergency room already in labor.  At 6:24 p.m., a fetal heart rate monitor was placed on Ms. Shefcyk.[2]

At 6:39 p.m., Dr. Hema Datwani—a third-year OB/GYN resident—noted variable decelerations[3] and category 2 fetal monitoring strips ("FMS").[4]  At that time, Dr. Datwani repositioned Ms. Shefcyk and administered oxygen.  At 6:58 p.m., the FMS showed "variable decelerations" and Ms. Shefcyk was "turned to her left side, and continued to receive oxygen." (ECF No. 60-1 ¶ 7.)

At 7:55 p.m., when the FMS tracings were "category 2 and she was remote from delivery," Dr. Henry Su "called a stat C-section."  (Id. ¶ 10.)  At 7:57 p.m., Ms. Shefcyk was moved to an operating room where K.F. was delivered via C-section at 8:13 p.m.  (Id.)  Upon delivery, Dr. Su "noted that K.F. had two tight nuchal cords and a body cord,[5] and Apgar scores—a test performed to evaluate the health of a newborn—were 3 at 1-minute and 6 at 5-minutes after birth."  (Id. ¶ 11.)

---

of Material Facts (Id.)  Because Plaintiff denies many "characterizations" contained in Defendant's SUMF, I include only factual assertions that appear uncontested.  For terms not described or explained by either Party, I rely on other documents or depositions in the summary judgment and Daubert record.  (See ECF No. 56-1 (American College of Obstetricians and Gynecologists ("ACOG") Practice Bulletin).)

[2] "Intrapartum electronic fetal monitoring ("EFM") is used for most women who give birth in the United States" to measure fetal heart rate and rhythm.  (ECF No. 56-1 at 2 of 10.)  Clinicians use fetal heart rate ("FHR") tracings in the daily care and management of their patients.  (See ECF No. 56-1.)

[3] "Variable decelerations" can denote an "abrupt decrease" in fetal heart rate.  (ECF No. 56-1 at 3 of 10.)

[4] "Fetal monitoring strips" appears to be synonymous with "fetal heart tracings"—readings collected from fetal heart rate monitors.  The ACOG Bulletin describes a three-tiered system for interpreting and managing different categories of tracings.  "Category II FHR tracings include[] all FHR tracings not categorized as Category I or Category III." (ECF No. 56-1 at 4 of 10.)  Each category describes different heart rates or events.  For example, Category I tracings describe a baseline heart rate of "110-160 beats per minute," whereas Category III tracings can describe an "[a]bsent baseline FHR."  (Id.)  Category II tracings include FHR indicating "[r]ecurrent variable decelerations accompanied by minimal or moderate baseline variability."

[5] According to Dr. Rachel Pantoja—a third-year OB/GYN resident who treated Ms. Shefcyk—this means that there were umbilical "cord[s] wrapped around the baby's neck twice and then once around the baby's body."  (ECF No. 59 at 3; Dep. of Dr. Rachel Pantoja at 31:16-21.)

At 11:55 p.m., K.F. was transferred to St. Christopher's Hospital for Children. (Id. ¶ 13.) There, he was diagnosed with hypoxic-ischemic encephalopathy ("HIE") and later with quadriplegic cerebral palsy. (Id.; ECF No. 68-32 at 9 ¶ 16.) The essence of Plaintiff's claim is that Temple should have called for the C-section earlier and that its delay in doing so "during the final hour of [K.F.'s] delivery caused [these] injuries." (ECF No. 69 at 2.)

## II.    LEGAL STANDARDS

In exercising my gatekeeping function, I "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," and that the expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); Fed. R. Evid. 702. To determine whether to admit expert testimony under Rule 702, I evaluate: (1) the expert's qualifications; (2) the reliability of his methodology; and (3) whether the testimony is relevant and helpful for the trier of fact. Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003); Breidor v. Sears, Roebuck & Co., 722 F.2d 1134, 1139 (3d Cir. 1983) ("Helpfulness is the touchstone of Rule 702.").

## III.    DISCUSSION

The Parties agree that the main dispute in this lawsuit is whether the delay in K.F.'s delivery caused his hypoxic brain injuries. (See ECF No. 59 at 1; ECF No. 68 at 2.) To support its claim, Plaintiff plans on calling four expert witnesses. The Motions before me concern three of those witnesses:

- Dr. Zinkhan: a board-certified and fellowship-trained "[n]eonatologist with more than 10 years of clinical experience as an attending physician, the physician-in-charge of taking care of sick newborn infants." (ECF No. 69-32 at 10 of 12.);

3

- <u>Dr. Nelson</u>: a board-certified and fellowship-trained pediatric neurologist who "routinely treats children that have suffered HIE and has reviewed 'thousands' of records of children that have suffered HIE." (<u>Id.</u>)
- <u>Dr. Landon</u>: a board-certified obstetrician and maternal fetal medicine doctor who is "presently [the] Professor and Chair of the Department of Obstetrics and Gynecology at the Ohio State University College of Medicine." He maintains an active clinical practice and has been delivering babies for decades. (<u>Id.</u>)

Each of these witnesses opine that K.F.'s injuries occurred at or before the time of birth. Temple asks me to preclude these experts from providing such opinions. In doing so, Temple challenges the qualifications of Drs. Zinkhan and Nelson and argues that the methodologies employed by Drs. Zinkhan, Nelson, and Landon are so unreliable as to warrant exclusion.

**A. Qualifications**

"'Qualification requires that the witness possess specialized expertise,' and the Third Circuit has explained that a 'broad range of knowledge, skills and training qualify an expert.'" <u>Brooks v. Trans Union</u>, No. 22-48, 2024 WL 3625143, at *4 (E.D. Pa. Aug. 1, 2024) (quoting <u>Pineda v. Ford Motor Co.</u>, 520 F.3d 237, 244 (3d Cir. 2008)). Whether an "expert is qualified . . . centers around whether they have 'specialized knowledge' which can be 'practical experience as well as academic training and credentials.'" <u>Jones v. SWEPI L.P.</u>, 643 F.3d 547, 561 (W.D. Pa. 2022) (quoting <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir. 1998)). Drs. Zinkhan and Nelson certainly meet this low bar.

Dr. Zinkhan is a neonatologist with more than "10 years of clinical experience as an attending physician." (ECF No. 68-4 at 1.) Her practice involves evaluating "infant[s] for encephalopathy that may be HIE." (Dep. of Dr. Erin Zinkhan at 33:10-13.) Every time she diagnoses a baby with HIE, she determines the cause of the HIE in "conjunction with what [] obstetricians tell [her] and the laboratory test[s] that were done." (<u>Id.</u> at 37-38.) These diagnoses include a determination regarding the timing of the cause of the HIE. (<u>Id.</u> at 38:5-7.)

4

Dr. Nelson is a pediatric neurologist who serves on the faculty of two medical schools as a professor of pediatrics, neurology, neurosurgery, and psychiatry. (ECF No. 58-16 at 2 of 6.) Although Dr. Nelson cannot himself interpret the fetal monitoring strips, ultrasounds, or MRIs, he relies in part on other doctors' analyses in coming to an opinion "within the scope of a neurologist." (See Dep. of Dr. Stephen Nelson at 26:19-22; id. at 24-27.) Moreover, he has reviewed "thousands of records of children that have suffered HIE" and he understands the "ways to tell how long [HIE has] been going on for." (Id. at 35:14-17.)

Despite both experts' credentials and past experience in diagnosing and treating HIE, Temple urges that these witnesses are not qualified to provide causation opinions. The gravamen of Temple's argument is that because Drs. Zinkhan and Nelson are neither obstetricians nor experts in maternal fetal medicine, and because they cannot provide their own interpretation of the fetal monitoring strips, ultrasounds, or MRIs at issue—they impermissibly rely on other doctors' interpretations of certain data. (See ECF No. 59 at 11-16.)

To the extent that Temple argues Drs. Zinkhan and Nelson are unqualified because they are not obstetricians, I disagree. Indeed, "[a]s long as an expert possesses relevant qualifications as to a topic or area of knowledge, the fact that they do not have special skills in the most relevant subspecialty does not render them unqualified to testify." Power v. Hewlett-Packard Co., No. 17-154, 2023 WL 2705237, at *6 (W.D. Pa. Mar. 30, 2023); see also id. (citing Holbrook v. Lykes Bros. S.S. Co., Inc., 80 F.3d 777, 781-82 (3d Cir. 1996)) ("[D]octor specializing in internal medicine qualified to render an opinion regarding the diagnosis of mesothelioma and related treatment even though he was not an oncologist, pathologist, or expert in definitive cancer diagnosis."); Nichols v. Morrisey, No. 23-637, 2024 WL 871322, at *2 (E.D. Pa. Feb. 29, 2024) (quoting Cree v. Hatcher, 969 F.2d 34, 38 n.5 (3d Cir. 1992)) ("Daubert does not require a

5

physician expert to specialize in the field or sub-field regarding which he testifies. Instead, 'a physician is entitled to render an opinion in medical fields which are outside his area of specialization,' and 'the fact that a doctor is not a specialist in a particular field goes not to the admissibility of the opinion but rather to the weight that the jury may wish to place upon it.'").

Drs. Zinkhan and Nelson are qualified to testify as to causation because their background and everyday experience involves the diagnosis and treatment of HIE. Temple's concerns thus go "more to the weight to be given the expert[s'] testimony than to its admissibility." Holbrook, 80 F.3d at 782.

Next, Temple urges that Drs. Zinkhan and Nelson improperly "parrot" other experts' interpretations of fetal monitoring strips and radiological findings in coming to their conclusions. (ECF No. 59 at 12, 14.) Temple appears to argue that because neither doctor is qualified to interpret K.F.'s fetal heart rate tracings, they cannot rely on interpretations of those tracings in reaching their conclusions. In support, Temple cites, *inter alia*, Diawara v. United States, where an expert was precluded from testifying in certain areas because he had no prior experience in those fields and instead relied "*solely* on [] evaluations and reports prepared by" others. No. 18-3520, 2020 WL 1151162, at *6 (E.D. Pa. Mar. 9, 2020) (emphasis added).

Diawara, however, is inapposite. Drs. Zinkhan and Nelson do not rely *solely* on other experts to form their opinions. Instead, they base their causation opinions on their own knowledge, understanding, and practice in diagnosing or treating HIE. That these doctors rely, in part, on other experts' interpretations of certain evidence in coming to their separate causation opinions is of no moment. See Holbrook, 80 F.3d at 781 (finding that the expert's "reliance on [a] pathology report to confirm his diagnosis [did] not reflect negatively on his qualifications or ability to diagnose his patient; to the contrary, it reflect[ed] routine procedure in medical treatment, as recognized by Rule

6

703."); see also Snider v. Sterling Airways, Inc., 758 F. App'x 283, 288 (3d Cir. 2018) (finding that expert "was permitted to rely on the findings of other experts in forming his conclusions."); In re Wagner, No. 06-1026, 2007 WL 966010 at *4 (E.D. Pa. Mar. 29, 2007) ("[E]xperts are permitted to rely on materials used by other experts in developing their own opinions.").

Both Drs. Zinkhan and Nelson rely on their past experience, medical records, and other record evidence in coming to their conclusions. In these circumstances, I find that both are qualified to offer causation opinions. See In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 741 (3d Cir. 1994) ("[A] witness proffered to testify to specialized knowledge must be an expert," but the specialized-knowledge requirement is "interpreted . . . *liberally*," and "a broad range of knowledge, skills, and training qualify an expert as such." (emphasis added)).

### B. Reliable Methodology

"To meet the reliability standard, the proffered testimony must 'be based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" Rhoads Indus., Inc. v. Shoreline Found., Inc., No. 15-921, 2021 WL 2778562, at *3 (E.D. Pa. July 2, 2021) (quoting Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 80-81 (3d Cir. 2017)). An expert's scientific opinion need not have "the best foundation, or even [be] supported by the best methodology or unassailable research." In re TMI Litig., 193 F.3d 613, 665 (3d Cir. 1999). Indeed, the "standard for reliability is not that high," and instead, I look to whether the expert's testimony is supported by "good grounds." Karlo, 849 F.3d at 81 (internal quotations and citations omitted).

### i. Dr. Zinkhan

Temple contends that Dr. Zinkhan's causation opinion is supported by "unreliable methodology." (ECF No. 59 at 16.) It urges that she misinterpreted two of the articles she relies

7

upon and used "subjective measures and unsupported speculation" to bolster her opinion. (Id. at 17.) I take each of Temple's arguments in turn.

First, that Dr. Zinkhan purportedly misinterpreted two of the articles she reviewed before coming to her conclusion does not necessarily render her methodology unreliable. Rather, the "question of whether a study's results were properly . . . interpreted ordinarily goes to the weight of the evidence, not to its admissibility." Karlo, 849 F.3d at 83.

Second, Dr. Zinkhan testified that in reaching her opinion regarding causation and timing, she relied in part on the fact that "Kimberly [Shefcyk] [reported] good fetal movement . . . throughout [the] pregnancy" which was "documented in the prenatal record." (Dep. of Dr. Erin Zinkhan at 43:5-10.) Temple urges such reliance was improper because Dr. Zinkhan "admits that this is a subjective measure." (ECF No. 59 at 18.) I disagree. The Rules allow for an expert to rely on the reports of others, including reports which contain "statements by patients and relatives." Fed. R. Evid. 703 advisory committee's note. Dr. Zinkhan's reliance on Ms. Shefcyk's prenatal records and her "validation of [such] report[s], subject to cross-examination . . . is sufficient to validate [the records] as a basis of [her] expert opinion." Snyder v. West Am. Ins. Co., No. 01-5033, 2003 WL 21497359, at *1 n.1 (E.D. Pa. June 9, 2003); see also Madden v. A.I. DuPont Hosp. for Children of the Nemours Found., 264 F.R.D. 209, 217 (E.D. Pa. 2010) (finding physician expert's methodology was reliable where he relied, in part, on medical records to form his conclusion).

Even assuming *arguendo*, that I found that Dr. Zinkhan misinterpreted these articles and improperly relied upon the prenatal records, she may be cross examined on these points and may still have good grounds for her conclusion. See Karlo, 849 F.3d at 83 (quoting Paoli II, 35 F.3d at 744.) ("[T]here could be good grounds for an expert's conclusion 'even if the judge thinks that . .

. a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.'"). Temple attacks only some of the bases for Dr. Zinkhan's opinion. In coming to her conclusion, Dr. Zinkhan also relied on, *inter alia*, a review of the materials, medical records, and her knowledge, training, and experience as a neonatologist who "care[s] for newborn patients requiring therapeutic hypothermia for HIE." (ECF No. 68-4 at 2, 8.) In these circumstances, where a majority of Dr. Zinkhan's methodologies remain unchallenged, I will not preclude her testimony as unreliable.

        ii.    *Dr. Nelson*

Temple next argues that Dr. Nelson did not employ reliable methodologies because he "does not seek to offer scientific literature or other evidence in support of his causation opinions." (ECF No. 59 at 16.) To the extent that Temple urges that Nelson was required to cite or perform any scientific studies to support his conclusion, it is incorrect. See Henderson v. Matthews, No. 19-3040, 2021 WL 2012544, at *4 (E.D. Pa. May 20, 2021) (citing Heller v. Shaw Indus., Inc., 167 F.3d 146, 157 (3d Cir. 1999) ("A physician is not required to cite to or perform studies to support his or her opinion as to the cause of an injury.").

In any event, Dr. Nelson bases his opinions on his "education, training, background, specialized knowledge and experience in the areas of pediatrics and neurology, [his] review and understanding of the peer-reviewed literature and textbooks that address the topics discussed in [his] report, [his] review of the medical records . . . , and [his] personal examination of [the minor]." (ECF No. 58-16 at 2-3 of 6.) Once again, "[a]n expert need not have the best foundation for their opinion—but they must have good grounds for it." Transcontinental Gas Pipe Line Co., LLC v. Permanent Easements for 3.16 Acres, No. 17-737, 2023 WL 3727514, at *2 (M.D. Pa. May 30, 2023) (internal quotations and citations omitted); see also Henderson, 2021 WL 2012544, at *5

9

(internal citation omitted) (holding expert's reliance on medical records and "his experience as a physician treating the type of injury plaintiff experienced as opposed to citing to peer reviewed studies does not render his testimony unreliable under Rule 702."). Temple does not even explain why Dr. Nelson's other bases or methods for forming his opinions were insufficient, identifying only a dearth of scientific literature and "other evidence." This is not enough to make a colorable attack on Dr. Nelson's methodology under Daubert and Rule 702.

Accordingly, I find that Dr. Nelson's opinion is based upon reliable methodologies.

### iii. Dr. Landon

Finally, Temple argues that Plaintiff's maternal-fetal medicine expert—Dr. Landon—lacks a reliable methodology for his causation opinions. Temple contends that Dr. Landon's opinions are "entirely based upon '[t]he evolution of the [fetal] monitoring strips.'" (ECF No. 59 at 19 (citing Dep. of Dr. Mark Landon at 54:2-3).) Such reliance, it urges, is improper given Dr. Landon's contradictory writings from a book chapter he authored in 1986. (Id.) There, Dr. Landon purportedly explained that the "interpretation of abnormal patterns [through fetal monitoring strips] has been fraught with difficulty and with considerable false positive[s]," and that "the medical community [and] governmental agencies [both] question the value of routine fetal monitoring." (ECF No. 59 at 19 (citing Dep. of Mark Landon at 20:5-12).) Temple interprets this to mean that Dr. Landon "concedes that interpreting fetal monitoring rates is rife with false positives and that it *cannot* diagnose hypoxia or fetal injuries." (ECF No. 59 at 20 (emphasis in original).)

That Dr. Landon—in a publication from 1986—apparently undermines the *value* of routine fetal monitoring is not fatal to the admissibility of his opinion. This fact may be relevant on cross-examination but does not bear on my admissibility determination.

10

Again, Dr. Landon need only have good grounds for his opinions in this case. Dr. Landon does not rely solely upon the fetal monitoring strips as Temple contends. Instead, he bases his opinions on medical records, depositions, his experience as the OBGYN Department Chair at the Ohio State University College of Medicine, as well as "[t]he presence of the [] double nuchal cord, [and] the blood gas at delivery." (Dep. of Dr. Mark Landon at 53:5-9; see also ECF No. 58-20.)

Accordingly, I will not exclude Dr. Landon's testimony.

### C. Summary Judgment

In moving for summary judgment, Temple explains that if its "Omnibus Rule 702 Motion to Preclude Plaintiff's Expert Opinions . . . i[s] granted, there is no genuine dispute of material fact as to whether the delay in calling a C-Section caused K.F.'s injuries." (ECF No. 60 at 3.) It thus relies upon a finding that Drs. Zinkhan and Nelson are not qualified and they—and Dr. Landon—cannot provide admissible causation opinions. (Id.) Because I have denied its Omnibus Motion, there remains a genuine dispute of material fact regarding whether the delay in calling a C-Section caused the injuries at issue.

Accordingly, I will deny Temple's Motion for Summary Judgment.

### IV. CONCLUSION

The Parties have requested a Daubert hearing. I will deny these requests as the record itself is sufficient. See United States v. Xue, 597 F. Supp. 3d 759, 770 (E.D. Pa. Apr. 6, 2022) ("A court is not required to hold a Daubert hearing, even if it is requested, if the record allows the court to rule on admissibility."); Marcum v. Columbia Gas Transmission, LLC, 549 F. Supp.3d 408, 418 n.3 (E.D. Pa. 2021) ("In this case, because the full record on this issue is presently before the Court, including [] several reports and deposition testimony, a Daubert hearing is unnecessary.").

An appropriate Order follows.